**BELLIVEAU BUILDING CORPORATION**

v.

**William J. O'COIN, Jr., et al.**

**No. 98–445–Appeal.**

Supreme Court of Rhode Island.

Dec. 18, 2000.

George M. Prescott, Lincoln, George M. Prescott, Jr., for Plaintiff.

Lauren E. Jones, Providence, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

Did claims for tortious interference with contract arise from the filing of two notices in the land-evidence records pertaining to a right of first refusal (RFR) to purchase real estate? Not in this case, we hold, for the reasons recorded below.

### Facts and Travel

The defendants, William J. O'Coin, Jr. and Claire H. O'Coin (O'Coins), appeal from a Superior Court judgment for the plaintiff Belliveau Building Corporation (BBC). After a nonjury trial, the court found the O'Coins liable for tortious interference with BBC's contract to sell real estate to a third party. The court then awarded BBC compensatory damages plus costs. BBC also cross-appeals, challenging the trial court's refusal to award punitive damages and its preclusion on *res judicata* grounds of BBC's attack on the propriety of the O'Coins' filing of a first notice in the land-evidence records concerning their RFR.

This is the second time we have addressed the legal issues arising out of this controversy. *See Belliveau v. O'Coin*, 557 A.2d 75 (R.I.1989) (*Belliveau I*). Because our opinion in *Belliveau I* provides a comprehensive summary of the underlying facts in this case, we will not repeat them all here except to sketch the essential particulars as they bear on the issues now before us.

In 1979 the O'Coins purchased a parcel of land in Cumberland and subdivided it into five lots. Between 1982 and 1985, a married couple, Sandra and Ron Belliveau (Belliveaus) purchased four of these lots from the O'Coins, including lot No. 3, which Sandra bought in 1985. Before the O'Coins conveyed lot No. 3 to Sandra, the O'Coins recorded (with Sandra's approval) a declaration of twenty-one restrictive covenants applicable to lot No. 3. One of these restrictions gave the O'Coins a preemptive RFR in the event that Sandra later sought to sell or lease lot No. 3 to another prospective purchaser or tenant.[1]

---

1. The RFR or preemptive right regarding lot No. 3 provided:

   "The grantee or grantees of premises conveyed by William J. O'Coin, Jr. and Claire H. O'Coin shall not rent, sell or convey the said premises or any part thereof to any prospective tenant or purchaser without first offering the same to William J. O'Coin, Jr. and Claire H. O'Coin in writing, for the same consideration and upon the same terms for and upon which the grantee is willing to rent, sell or otherwise convey, and stating therein the name of the prospective purchaser or tenant. William J. O'Coin, Jr. and Claire H. O'Coin shall exercise this pre-emptive right, if at all, in writ-

The Belliveaus served as the sole officers and shareholders of BBC, their wholly owned construction business. In December 1986, in an effort to take advantage of certain favorable federal income tax laws that were about to expire, Sandra conveyed lot No. 3 to BBC for $60,000 (the Sandra–BBC conveyance) without first notifying the O'Coins or giving them any opportunity to exercise their RFR. Approximately four months later, however, in May 1997, Sandra wrote to the O'Coins. In her letter, she disclosed that, for tax purposes, she had conveyed the property to BBC the previous December. She then requested the O'Coins to waive their preemptive right with respect to the BBC conveyance, assuring them that BBC would honor the RFR in any later sale of the property to a third party. The O'Coins, however, believing that the sale of lot No. 3 from Sandra to BBC had triggered their RFR—thereby entitling them to purchase lot No. 3 for $60,000—refused to execute the requested waiver. Instead, on May 13, 1987, they recorded a "Notice of Intent to Exercise Pre–Emptive Right" (first notice) in the Cumberland land-evidence records, stating that they were thereby exercising their right to purchase lot No. 3 pursuant to the terms of the RFR; that is, "for the same consideration [$60,000] and upon the same terms" as Sandra had conveyed lot No. 3 to BBC. In response, the Belliveaus commenced a declaratory judgment action in Superior Court to determine the validity and effect of the O'Coins' purported exercise of their RFR. Eventually, in 1988, the Superior Court ruled in favor of the O'Coins, granting them specific performance of the RFR with respect to Sandra's transfer of lot No. 3 to BBC for $60,000. On appeal, however, this Court reversed, holding that the tax-motivated conveyance from Sandra to BBC, the Belliveaus' wholly owned corporation, did not trigger the O'Coins' RFR. *Belliveau I*, 557 A.2d at 79. Thus, the Court allowed BBC to take title to lot No. 3—subject to the recorded rights of the O'Coins concerning this property, including their valid RFR. *Id.* at 80.

On July 13, 1987, while *Belliveau I* was pending, but before either the Superior Court or this Court on appeal had ruled on whether the Sandra–BBC conveyance had triggered the O'Coins' RFR, BBC entered into an agreement to sell lot No. 3 to Stephen and Patricia Butler (Butlers) for $349,000. By letter dated July 20, 1987, BBC notified the O'Coins of this transaction and requested them to respond thereto within fifteen days or else they would be deemed to have waived their RFR. Within this time frame, (and still before the Superior Court had issued its decision in *Belliveau I* ), the O'Coins recorded a second "Notice of Intent to Exercise Pre–Emptive Right" (second notice) in the Cumberland land-evidence records. The second notice expressly referred to the first notice, reiterated the contents thereof verbatim, and specifically asserted that the O'Coins still intended to purchase lot No. 3 for $60,000, notwithstanding the proposed BBC Butler transaction selling lot No. 3 for $349,000.[2]

ing within fifteen (15) days from the date it receives the said offer. In the event the right is not exercised the grantee may sell or rent said premises for the stated consideration to the prospective purchaser or tenant named in the notice. In the event that the grantee or grantees are the prospective tenant or purchaser, this provision shall not apply."

2. The second notice stated, in relevant part:
"We, [the O'Coins] * * * hereby acknowledge receipt of letter dated May 1, 1987 from Sandra Belliveau informing us of the transfer of the above captioned property to BELLIVEAU BUILDING CORPORATION.

"Pursuant to Restrictive Covenant and Condition No. 6 as set forth [in the Cumberland land-evidence records] * * * we are exercising our right to purchase [lot No. 3] * * *.

"Further, this is a SECOND NOTICE AND DEMAND to purchase for the same consideration the transfer which took place December 29, 1986. (Refer to Book 329 PAGE 356—FIRST NOTICE).

"With respect to Notice of Proposed Sale to Stephen B. and Patricia E. Butler dated July 20, 1987 we do not acknowledge or give credence to the same since we have

After the Superior Court ruled in favor of the O'Coins in January 1988 and declared that they had the right to purchase lot No. 3 for $60,000, the Butlers withdrew from the purchase and sale contract with BBC.

On appeal, however, this Court in 1989 reversed the judgment of the Superior Court in *Belliveau I.* The Belliveaus then recorded that decision in the land-evidence records to clear BBC's title to the property. Shortly thereafter, BBC sold lot No. 3 to Alan and Patricia Riendeau for $345,000 without the O'Coins attempting to exercise their RFR. BBC ultimately filed this damages action in Superior Court, asserting that, by filing their notices in the land-evidence records, the O'Coins had tortiously interfered with the Butler contract and that, as a result, BBC had been damaged, mostly by incurring holding costs for lot No. 3 that it otherwise would have avoided if the O'Coins had not filed their notices and disrupted the Butler sale. After a nonjury trial, the Superior Court ruled that *res judicata* barred BBC from challenging the O'Coins' filing of the first RFR notice, but that, with regard to the second RFR notice, the O'Coins had tortiously interfered with the BBC–Butler contract, entitling BBC to recover compensatory damages from the O'Coins.

## Issues Presented

On their respective appeals, one or both sides contend that the trial justice erred in how she resolved issues of claim preclusion, tortious interference with contract, proximate causation, and punitive damages. The O'Coins first argue that the trial justice erred by not applying the doctrine of *res judicata* to bar BBC's tortious-inference-with-contract claim concerning their *second* recorded notice, thereby allowing BBC to proceed to judgment on this cause of action. In its cross-appeal, BBC counters that the trial justice erred by applying *res judicata* to that portion of the O'Coins' tortious-interference claim that was based upon the *first* recorded RFR notice. But because our resolution of the merits of BBC's tortious interfer-

ence claim disposes of this entire controversy, we shall assume, without deciding, that claim-preclusion doctrines like *res judicata* did not foreclose BBC's tortious interference claims with respect to *either* the first or second notices filed by the O'Coins. Thus, for the purposes of resolving these appeals, we shall assume *arguendo* that BBC was not barred by *res judicata* from bringing a so-called coercive action for damages as "supplemental" to the initial declaratory judgment of *Belliveau I.* See generally G.L.1956 § 9–30–8 ("[f]urther relief based on a declaratory judgment or decree may be granted whenever necessary or proper"); *see also ElGabri v. Lekas,* 681 A.2d 271, 275–76 (R.I.1996) (applying Restatement (Second) *Judgments* § 24 (1982) to determine whether a factual grouping constitutes a "transaction" or "series of connected transactions" for res judicata purposes).

## Standard of Review

■ The standard of review we apply in this case is well settled: "This Court will not disturb the findings of a trial justice sitting without a jury in a civil matter 'unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.'" *Paradis v. Heritage Loan and Investment Co.,* 701 A.2d 812, 813 (R.I.1997) (quoting *Harris v. Town of Lincoln,* 668 A.2d 321, 326 (R.I.1995) and citing *Gross v. Glazier,* 495 A.2d 672, 673 (R.I.1985) and *Lisi v. Marra,* 424 A.2d 1052, 1055 (R.I.1981)). With these assumptions and legal principles in mind, we proceed to consider whether the O'Coins were legally justified in recording the notices at issue.

## I

## Tortious Interference with Contract and the Defense of Justification

■ The trial justice found that BBC had established the required elements of

outstanding, our exercise of rights in effect

and of record."

tortious interference with contract and that the O'Coins had failed to show that the intentional interference complained of—their recording of the second notice—was justified. The O'Coins argue that they were justified in recording both notices based upon their holding of a valid RFR and their colorable right to exercise that RFR in connection with Sandra's sale of lot No. 3 to BBC. Therefore, they suggest, the trial justice erred in finding them liable on the tortious interference claim. Specifically, the O'Coins contend that they were privileged to record not only the first notice, in May 1987, but also the second notice, in August 1987, to protect the enforceability of their RFR concerning lot No. 3 after they received notice of the proposed BBC–Butler sale.

To establish a prima facie case of tortious interference with contractual relations, we have held, the aggrieved party must show "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his [or her] intentional interference; and (4) damages resulting therefrom." *Smith Development Corp. v. Bilow Enterprises, Inc.*, 112 R.I. 203, 211, 308 A.2d 477, 482 (1973). To establish intentional interference with contract, no showing of actual malice is necessary; rather, a showing of "legal malice" will suffice: "Malice, in the sense of spite or ill will, is not required; rather legal malice—an intent to do harm without justification—will suffice." *Jolicoeur Furniture Co. v. Baldelli*, 653 A.2d 740, 753 (R.I.1995) (quoting *Mesolella v. City of Providence*, 508 A.2d 661, 669–70 (R.I.1986)). But after the plaintiff establishes these prima facie elements, "[t]he burden of proving sufficient justification for the interference shifts to the defendant." *See Smith Development Corp.*, 112 R.I. at 211, 308 A.2d at 482; *see also Mesolella*, 508 A.2d at 669–70.

Therefore, to establish a prima facie case of intentional interference with contract, aggrieved parties must allege and prove not only that the putative tortfeasors intended to do harm to the contract but that they did so without the benefit of any legally recognized privilege or other justification. Upon such a showing, the alleged offenders would then have the opportunity—and the burden—to prove that the contractual interference was indeed justified.

Here, the principal issue is whether the O'Coins have carried their ultimate burden to prove justification. The trial justice concluded that the O'Coins' interference was unjustified. First, she explained that "even the exercise of a contractual right can constitute tortious interference." She then interpreted our decision in *Belliveau I* as having "determined that the defendants' attempt to exercise their right of first refusal in filing the first preemptive notice was invalid." Second, she found unpersuasive the O'Coins' argument that they were only attempting to protect their property rights by filing the second notice:

> "The defendants already had on record their first preemptive notice which gave notice to any prospective purchaser that the defendants had an outstanding claim for a right of first refusal. The second preemptive notice did not serve the defendants any more than the first preemptive notice, other than to directly affront the plaintiff's contract with the Butlers."

We are of the opinion that the trial justice was clearly wrong in making these findings.

First, our decision in *Belliveau I* does not lend any support to the conclusion that the O'Coins acted *without justification* in attempting to exercise their RFR by filing either the first or second notices. It is true that in *Belliveau I* we held that the Sandra–BBC conveyance did not trigger the O'Coins' RFR. However, we explained in *Belliveau I* that, "on its face, restrictive covenant No. 6 [containing the preemptive right at issue] create[d] a valid right of first refusal on behalf of [the O'Coins]." *Belliveau I*, 557 A.2d at 76. We also noted

that the Belliveaus had conceded the facial validity of the O'Coins preemptive right; thus, the central issue in *Belliveau I* was "not the validity of the restriction but rather the valid enforcement of that restriction, given the objectives it was created to achieve and the facts and circumstances surrounding this case." *Id.* at 77. Although we ultimately held that the less-than-arm's-length transfer involved in the Sandra–BBC conveyance failed to trigger the O'Coins' RFR, our holding did not suggest that the O'Coins' filing of the first notice had been unjustified. Indeed, our conclusion in *Belliveau I* was tempered by equitable concerns (after Sandra agreed to the RFR, BBC had improved lot No. 3 by constructing a home thereon) and by the parties' likely purpose in entering into the RFR, but not by any notion that the O'Coins had acted unjustifiably or improperly in recording the first notice. *See id.* at 79 ("[I]t would be inequitable to allow [the O'Coins] to exercise their right of first refusal in the present situation. Equity should deny relief to a party seeking enforcement of a restrictive covenant 'if the harm done by granting the injunction [enforcing the covenant] will be disproportionate to the benefit secured thereby.' ") (quoting Restatement *Property* § 563 (1944)). *Belliveau I*, therefore, does not support a finding of unjustified interference in the present action.

■■ To recover under a claim for tortious interference of contract, BBC need not have shown that the O'Coins engaged in falsehood or in any independent tortious

conduct. To prevail, however, BBC had to prove that the O'Coins acted intentionally to interfere with BBC's contractual relationship with a third-party buyer, that they caused harm in so doing, and, ultimately, that they acted "without justification," or for an "improper" purpose. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* ch. 24, § 129, at 978–79 (5th ed.1984); Restatement (Second) *Torts* § 766, at 7 (1979). Unlike other intentional torts, tortious interference with contract "has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege to act * * *." Restatement (Second) *Torts* § 767, at 28.[3] Compare, for example, the privileges erected under the law of defamation or its close cousin, slander of title. *See, e.g., Brough v. Foley*, 572 A.2d 63, 67 (R.I.1990) (filing of *lis pendens* and the request for a temporary restraining order could not be considered slander of title); *DiBiasio v. Brown & Sharpe Manufacturing Co.*, 525 A.2d 489, 491–92 (R.I.1987) (applying "common interest" privilege in defamation action); *Ponticelli v. Mine Safety Appliance Co.*, 104 R.I. 549, 551–52, 247 A.2d 303, 306 (1968) (discussing and applying qualified-privilege concept in slander action). *See also* Restatement (Second) *Torts* §§ 583–98A, 611–12, 635, 646A–50A at 240–86, 297–305, 361–71 (1977) (discussing the absolute and conditional privileges applicable in defamation and slander-of-title actions). In the slander-of-title context, for example, the Restatement explicitly recognizes a conditional privilege of a

---

**3.** Because of this "lesser development" of default rules concerning the existence vel non of justification in any given interference-with-contract case, the Restatement provides seven factors that a court should weigh in determining whether an act of interference was "improper," or unjustified: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the contractual interests with which the conduct interferes; (4) the interests sought to be advanced by the actor; (5) the balance of social interests in protecting freedom of action of the actor and the contractual freedom of the putative plaintiff; (6) the proximity of the actor's conduct to the interference com-

plained of; and (7) the parties' relationship. *See* Restatement (Second) *Torts* § 767, at 26–7 (1979). The Restatement also explains that the determination of "improper" conduct "depends upon a judgment and choice of values in each situation," and that the factors listed above are not exhaustive for making such a determination. *Id.* at 28. For the reasons that follow, we conclude that the O'Coins' conduct in this case, when weighed against these factors and considered in light of the development of the law of tortious interference with contract in Rhode Island, does not amount to "improper interference" with the contract in question.

rival claimant to property: "A rival claimant is conditionally privileged to disparage another's property in land, chattels or intangible things by an assertion of an inconsistent legally protected interest in himself." *Id.* § 647, at 366. Such a privilege

"is necessary to enable the claimant to preserve the enforceability of his claim. If, knowing that another is offering or about to offer land or other thing for sale as his own, he fails to take advantage of a readily available opportunity to inform the intending purchaser * * * of his claim to the thing, he may preclude himself from afterwards asserting it against the purchaser. Therefore, he must be permitted *without fear of liability* to protect the enforceability of his claim by asserting it before the purchase is made." *Id.* (cmt.*f.*) at 367. (Emphasis added.)

The Restatement also recognizes a conditional defense to a tortious-interference-with-contract action; namely, asserting a "bona fide claim":

"One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another *does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.*" *Id.* § 773 at 52. (Emphasis added.)

We are of the opinion that the above-described legal principles are sound and should have been applied to this situation. Here, the essence of the O'Coins' position is that they were privileged to act as they did in recording the first and second notices because they sought to protect their RFR in the property, one that they believed in good faith had been triggered first by the Sandra–BBC conveyance and then again by a purchase-and-sale agreement from BBC to the Butlers.

The O'Coins were entitled to believe that their RFR might be impaired or destroyed if, in response to BBC's notice of the impending sale of lot No. 3 to the Butlers, they did nothing and allowed the Butlers to complete the purchase without any indication from them that they still intended to exercise their RFR. The means by which they sought to protect this interest was to put prospective third-party purchasers like the Butlers on record notice of their status as rival claimants to the property. In these circumstances, we hold that a rival claimant's good-faith assertion of a colorable property interest, when properly communicated by appropriate means (such as the filing of a truthful notice in the land-evidence records), is privileged and constitutes a defense to a claim of tortious interference with contract (or with prospective advantageous contractual relations). *Cf. Peoples Mortgage Co. v. Federal National Mortgage Association,* 856 F.Supp. 910, 938–42 (E.D.Pa.1994) (holding that a mortgage bank's threat to join a third party in pending litigation against defendant "mortgage service" corporation—intending thereby to cause that third party to withdraw from its mortgage-servicing agreement with defendant—was privileged as a good faith assertion of a colorable legal right); *C. Ed Lewis Co. v. Dragos,* 1 Utah 2d 328, 266 P.2d 499, 500 (1954) (holding that rival property claimant's good-faith statements to third parties about disputed boundary line that was the subject of pending litigation were neither slander of title nor tortious interference with a contractual relationship). This privilege, however, is a conditional one; the opposing party still may prevail upon a showing of "actual malice" on the part of the party recording such a notice.

We emphasize that our recognition of this privilege is based in no small part upon the substantive similarities between a tortious-interference claim in this context and an action sounding in slander of title (BBC, in fact, alleged both tortious interference with contract and slander of title

in its original complaint, but eventually it dropped the latter charge). More than a century ago, this Court recognized the privilege of a party to assert a property interest based upon an ultimately unfounded claim without incurring liability for slander of title—provided the party asserting the property interest did so in good faith:

> "[T]he mere fact that a person asserts a claim to the property, which is unfounded, does not warrant a presumption of malice. It is clearly not actionable for a [person] to assert his [or her] own rights at any time; and, *even where the defendant fails to prove such right, still, if at the time he [or she] spoke, he [or she] honestly supposed such right to exist, no action lies.* Hence, whenever a [person] claims a right or title in himself [or herself] in possession or remainder, it is not enough for the plaintiff to prove that he [or she] has no such right; *he [or she] must also show that the defendant could not honestly have believed in the existence of the right he [or she] claimed, or at least that he [or she] had no reasonable or probable cause of believing so.*" Hopkins v. Drowne, 21 R.I. 20, 25, 41 A. 567, 568–69 (1898). (Emphasis added.)

In protecting their valid property interest in lot No. 3, the O'Coins utilized proper means to assert their claim when they recorded their notices in the land-evidence records. No evidence showed that, when they did so, they did not "honestly suppose[ ] such right to exist." *Id.* In fact, the second notice truthfully dispelled any suggestion that the O'Coins intended to buy lot No. 3 at the higher price specified in the BBC–Butler agreement. This information clarified the basis for their claim to the property and provided an updated notice to BBC, the Butlers, and to any other potential third-party buyer about the nature and extent of their claimed property interest in lot No. 3 based upon the Sandra– BBC conveyance. We are convinced that, in the slander of title context, the O'Coins' conduct was akin to the filing of a

notice of lis pendens; thus, it would have been conditionally privileged. *See Monte- calvo v. Mandarelli,* 682 A.2d 918, 924 (R.I.1996) (filing of a notice of lis pendens is conditionally privileged and only overcome by a finding of actual malice). Indeed, in some jurisdictions, the recording of a notice of lis pendens would be an absolute defense to a tortious interference claim. *See, e.g., Woodcourt II Ltd. v. Mc- Donald Co.,* 119 Cal.App.3d 245, 173 Cal. Rptr. 836, 838 (1981); *Procacci v. Zacco,* 402 So.2d 425, 426–27 (Fla.Dist.Ct.App. 1981); *Lone v. Brown,* 199 N.J.Super. 420, 489 A.2d 1192, 1197 (App.Div.1985). Other courts recognize a qualified privilege in defense of a tortious interference action to record a lis pendens, a defense that can be overcome only upon a showing of "actual malice" or the like. *See McReynolds v. Short,* 115 Ariz. 166, 564 P.2d 389, 393–94 (App.1977); *Epstein v. Carrier,* 12 Conn. App. 691, 533 A.2d 1221, 1224–25 (1987); *Guerdon Industries, Inc. v. Rose,* 399 N.W.2d 186, 188 (Minn.Ct.App.1987); *Vin- tage Homes, Inc. v. Levin,* 382 Pa.Super. 146, 554 A.2d 989, 994 (1989); *Toltec Wa- tershed Improvement District v. Johnston,* 717 P.2d 808, 814–15 (Wyo.1986). *See also* Restatement (Second) *Torts* § 773 at 52. For similar reasons, we believe that the recognition of a qualified privilege is also appropriate in this context, one that a plaintiff may overcome only by a showing of "actual malice," that is proof that "the defendant could not honestly have believed in the existence of the right he [or she] claimed, or at least that he [or she] had no reasonable or probable cause of believing so." *Hopkins,* 21 R.I. at 25, 41 A. at 568– 69.

Though the O'Coins opted not to file a lawsuit against the Belliveaus or BBC for selling lot No. 3 to BBC without first notifying them or otherwise giving them the chance to exercise their RFR before title passed, their filing of the first notice effectively put would-be purchasers on notice that lot No. 3 was the subject of a legitimate dispute concerning the O'Coins' rights under their RFR and that the reso-

lution of that dispute could affect the title to the property. We are also of the opinion that the O'Coins' filing of the second notice was an appropriate response to BBC's attempted conveyance of lot No. 3 to the Butlers while the parties were still litigating the propriety of the first conveyance to BBC. It is undisputed that, in August 1987 (when the O'Coins filed the second notice) the parties to this litigation were both asserting colorable claims about the enforcement of the O'Coins' RFR as it pertained to the Sandra–BBC conveyance. But on July 20, 1987, BBC sent the O'Coins a letter stating that it had found a third-party buyer for lot No. 3 and that the O'Coins had fifteen days to exercise their RFR or that right would be considered waived. Faced with such a demand and given their colorable belief that their RFR was enforceable with respect to the Sandra–BBC conveyance, the O'Coins' filing of a second notice was entirely reasonable and appropriate. Indeed, both the O'Coins' and BBC's title experts testified at trial that, if they had found themselves in the O'Coins' situation, they too would have acted to preserve their RFR by recording their intention to exercise it in the land-evidence records after receiving notice of the proposed BBC–Butler sale. Moreover, the grantor in that sale was not one or both of the Belliveaus themselves, but BBC, an entity that was not even a party to the original restrictive covenants that included the RFR. Given these facts, it would be myopic to now hold that, in the retrospective light of *Belliveau I,* the O'Coins' recordation of their second notice to exercise their RFR was unjustified because they did so with actual malice. To so rule would subject those in situations like the O'Coins' to strict liability for attempting to protect their valid RFR in a situation in which that interest has been arguably triggered. This we decline to do.

Finally, the trial justice's decision contains no such finding of actual malice, and the record provides no basis for one. Ron Belliveau did testify that in response to his threat to place a mechanic's lien on the O'Coins' home for alleged nonpayment of a construction bill, Claire O'Coin stated that she would "bury" him and drive him out of business if he did so. But at trial, this testimony was directly contradicted by Claire O'Coin. The trial justice noted the parties' conflicting testimony and, in that part of her decision discussing the establishment of BBC's prima facie case, she stated as follows:

> "This Court finds that the statements of Claire O'Coin, threatening to drive the plaintiff out of business[,] combined with the timing of the filing of the second preemptive notice, demonstrates the defendants' intent to interfere with the Butlers' contract. The timing of an action can serve as evidence of an intent to interfere with or stop a contract."

Although these findings show that BBC proved the intentional-interference element of its claim, they do not support a conclusion that the O'Coins filed the second notice with actual malice. We have no doubt that the O'Coins intended to interfere with the Butlers' contract when they recorded the second notice. Indeed, that was its very purpose. But given their RFR and their objectively colorable belief (as evidenced by the first trial justice's ruling in their favor) that the Sandra–BBC conveyance had triggered the RFR, they were privileged to do so, even if they also hoped to "bury" BBC or drive it out of business in the process. *Cf. Brough,* 572 A.2d at 67 (explaining that, where law is unsettled, belief in validity of claim cannot be said to be unreasonable).

In sum, BBC failed to prove that the O'Coins "could not honestly have believed in the existence of the right [they] claimed [namely, the right to exercise their RFR based upon the Sandra–BBC conveyance], or at least that [they] had no reasonable or probable cause of believing so." *Hopkins,* 21 R.I. at 25, 41 A. at 568–69. As evidenced by the Superior Court's initial ruling in their favor, the O'Coins' belief in the existence of this right was not dishonest,

unreasonable, or without probable cause. Thus, because the O'Coins were entitled to believe that they had a right to purchase the property for $60,000 based upon Sandra's transfer of the property to BBC—even though that claim later turned out to be unfounded when this Court reversed the Superior Court's ruling in their favor—they were privileged to record both the first and second notices, notwithstanding any animus they may have harbored toward the Belliveaus or BBC because of some collateral dispute involving BBC's threatened filing of a mechanic's lien. And the mere fact that the O'Coins had no intention of buying the property for $349,000 when they recorded the second notice is of no legal consequence. All that matters is that they could "honestly have believed in the existence of the [legal] right [they] claimed," *id.*: namely, that given the Sandra–BBC conveyance, they possessed the preemptive right to buy the property for $60,000, and that, by filing the notices, they were helping to preserve that right, especially against potential bona fide purchasers for value like the Butlers. Therefore, we conclude, the O'Coins' conduct in this case constituted justified interference with the BBC–Butler contract, requiring us to reverse the trial justice's finding of liability under a claim of tortious interference with contract.

### Conclusion

Given our conclusion that the O'Coins were justified in recording both notices, we need not and therefore decline to reach the merits of other issues raised by the parties. For the aforementioned reasons, we sustain the O'Coins' appeal, deny BBC's appeal, vacate the Superior Court's judgment, and remand this case for entry of judgment in favor of the O'Coins.